## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-2415

DAYNA WOODWARD,

Plaintiff,

v.

ISABELLA RIVERA, in her individual capacity,
JAMES PHAN, in his individual capacity,
ANDREA LUTZ, in her individual capacity,
ANNALISSA REYNOLDS, in her individual capacity,
JUSTIN CHUBB, in his individual capacity,
DOE DEPUTIES 1-3, in their individual capacity, and
CITY AND COUNTY OF DENVER, a municipality,

Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Dayna Woodward, through her attorneys Tyrone Glover, Helen Oh, and Genevieve Mesch of Tyrone Glover Law, LLC, respectfully alleges as follows:

### I.     INTRODUCTION

1.     Plaintiff Dayna Woodward was sleeping soundly in her assigned cell at the City of Denver Downtown Detention Center ("DDC") when a group of Deputies violently assaulted her, leaving her with lasting physical, mental, and emotional injuries.

2.     After arguing with Ms. Woodward earlier in the night, DDC Deputies deliberately placed Ms. Woodward into a single cell that was beyond the coverage of security cameras and surveillance.

1

3.      After falling asleep in her new cell, Ms. Woodward was awoken by excruciating pain to her head and face. As she was regaining consciousness, she saw multiple Deputies leaving her cell. She was left with her face bruised, broken, and bleeding extensively. For nearly an hour, Ms. Woodward banged on her cell door for help until she was exhausted. Not a single Deputy responded or addressed Ms. Woodward's medical needs during this time.

4.      Finally, another inmate was able to summon help for Ms. Woodward—leading to her being taken to the hospital via ambulance and being treated for extensive facial fractures, lacerations to the left side of her face, and severe bleeding from her scalp. As a result of the traumatic injuries, the left side of her face was completely numb, and she had lost feeling in her left arm and leg. Ms. Woodward underwent immediate surgery and was hospitalized for four days.

5.      Despite her hospitalization, Deputies then attempted to cover up this assault by intentionally failing to create any incident reports, or any records at all, regarding Ms. Woodward's injuries. When Ms. Woodward later tried to file grievances regarding this incident, she was told there was no record that she had ever been injured or hospitalized, and that nothing had ever happened.

6.      The injuries suffered by Ms. Woodward are a direct result of the City of Denver's unconstitutional customs, policies and practices, including the City of Denver's deliberate indifference to Deputies taking detainees into areas without surveillance to abuse them, the consistent practice of ignoring detainees' pleas for medical assistance while housed in the booking area, the consistent practice of failing to conduct rounds at reasonable intervals, and the practice of failing to make incident reports related to injuries arising from the use of force by Deputies.

7.      Defendants' actions are exemplary of the type of abuse of power prohibited under the United States Constitution and the Colorado Constitution.

8.      Being imprisoned does not strip an individual of their human rights, nor provide license to assault that individual or disregard their serious medical needs. Absent legal accountability, Deputies at the Downtown Detention Center will continue to harm incarcerated individuals.

## II.    JURISDICTION AND VENUE

9.      Jurisdiction over Plaintiff's federal claims is conferred upon this Court pursuant to 28 U.S.C. § 1331, as the claims are brought pursuant to 42 U.S.C. § 1983, in addition to the Colorado Constitution.

10.     This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Jurisdiction supporting Plaintiff's claims for attorney fees and costs is conferred by 42 U.S.C. § 1988 and C.R.S. § 13-21-131.

11.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b). All of the events alleged herein occurred within the State of Colorado, and all of the parties were residents of the State at the time of the events giving rise to this Complaint.

12.     All available administrative remedies have been exhausted to the extent required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) and C.R.S. 13-17.5-102.3. There are no other administrative exhaustion requirements that would pose as a bar to the claims asserted herein.

### III.    PARTIES

13.    At all times relevant to this Complaint, Plaintiff Dayna Woodward was a citizen of the United States of America and resident of the State of Colorado.

14.    All at times relevant to this Complaint, Defendant Isabella Rivera was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in her capacity as a Deputy employed by the Downtown Detention Center.

15.    All at times relevant to this Complaint, Defendant James Phan was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in his capacity as a Deputy employed by the Downtown Detention Center.

16.    All at times relevant to this Complaint, Defendant Andrew Lutz was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in her capacity as a Deputy employed by the Downtown Detention Center.

17.    All at times relevant to this Complaint, Defendant Annalissa Reynolds was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in her capacity as a Deputy employed by the Downtown Detention Center.

18.    All at times relevant to this Complaint, Defendant Justin Chubb was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in his capacity as a Deputy employed by the Downtown Detention Center.

19.    All at times relevant to this Complaint, Defendant Doe Deputy 1 was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in their capacity as a Deputy employed by the Downtown Detention Center.

20.     All at times relevant to this Complaint, Defendant Doe Deputy 2 was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in their capacity as a Deputy employed by the Downtown Detention Center.

21.     All at times relevant to this Complaint, Defendant Doe Deputy 3 was a citizen of the United States and resident of the State of Colorado and was acting under color of state law in their capacity as a Deputy employed by the Downtown Detention Center.

22.     Defendant City and County of Denver ("Denver") is a municipality in Colorado. Denver Sheriff's Department ("DSD") is a law enforcement agency of Denver and not an independent entity that can be sued. Denver, through DSD, is responsible for the care and custody of inmates within Defendant Denver's jails. At all relevant times, Defendant Denver employed and was responsible for the supervision, discipline, and training of the DSD deputies, including Deputy Rivera, Phan, Chubb, Lutz, and Reynolds, as well as Doe Deputies 1-3. Denver is a municipal entity subject to suit pursuant to 42 U.S.C. § 1983. Denver is sued on the basis of its policies, customs, and practices which gave rise to the violation of Plaintiff's federal constitutional rights.

## IV.     FACTUAL ALLEGATIONS[1]

### A.  Ms. Woodward was Antagonized by Deputies from the Time She Arrived at Downtown Detention Center

23.     On August 2, 2023, Plaintiff Dayna Woodward was arrested and incarcerated at the Downtown Detention Center ("DDC").

---

[1] Unless stated elsewhere, the following allegations are based on information and belief.

5

24.     Upon arrival, Ms. Woodward was placed in 2B housing tier. The 2B housing tier ("2B") was the initial placement for detainees recently booked into DDC, and was referred to as the "Booking Area."

25.     From the moment she arrived, she observed that the Deputies at DDC—particularly those who monitored the 2B housing tier—seemed to view detainees as less than human, and exhibited contempt and cruelty in the way they treated the detainees.

26.     Ms. Woodward suffers from localized baldness on her scalp.

27.     Because of her localized baldness, Deputies started making fun of her and calling her "Baldie."

28.     Deputies also refused to do anything to alleviate the suffering of the detainees, or to provide them with basic hygiene and medical care.

29.     Vomit and feces were allowed to remain on the floors for extended periods of time without being addressed. Detainees were also forced to sleep in beds and to use blankets that were covered in vomit and feces. Deputies ignored requests for clean bedding or blankets.

30.     Ms. Woodward observed multiple other detainees who were actively detoxing from drugs or alcohol who were not being monitored or provided any medical assistance. These detainees were often actively vomiting in the communal area. Deputies were ignoring the pleas of these detainees for medical assistance.

31.     On August 4, 2023, Ms. Woodward was transferred to the 5H housing tier ("5H"), an area reserved for detainees after booking.

32.     In the early morning of August 6, 2023, there were several minor disturbances between detainees in 5H. Another detainee accused Ms. Woodward of putting her foot near that detainee's face and threatened to harm her.

33.     As a result, Ms. Woodward was moved from 5H and taken back to 2B.

34.     Two Deputies moved Ms. Woodward back to 2B. Ms. Woodward was placed on the first floor of 2B in Cell 107.

35.     In Cell 107, Ms. Woodward attempted to comfort one of her fellow detainees who was experiencing substance and alcohol withdrawals. Deputy Isabella Rivera gave Ms. Woodward a verbal warning. Deputy Rivera was angry and again referred to Ms. Woodward as "baldie."

36.     Ms. Woodward saw other detainees vomiting and shaking from withdrawals. Ms. Woodward tried to bring the unsanitary conditions to the attention of Deputies. The Deputies took no action to attend to the detainees' needs. Ms. Woodward tried again to comfort one of the withdrawing detainees.

37.     Deputy Rivera became extremely frustrated with Ms. Woodward. Deputy Rivera approached Ms. Woodward, repeatedly kicked her bunk, and told her to "get up baldie."

38.     Ms. Woodward, upset by Deputy Rivera's hostile tone and repeated attacks on her cancer related hair loss, responded, "What's your problem cunt?"

39.     Ms. Woodward's response angered Deputy Rivera's even further. As a result, Deputy Rivera charged Ms. Woodward with three violations: unauthorized visiting, disrupting security, and refusing to obey a direct order. These violations were reported at 6:26 a.m. on August 6, 2023.

40.     Deputy Rivera then told the other Deputies, "Put this bitch in 211."

41.     Ms. Woodward was placed in Cell 211 by Deputy Rivera and Deputy James Phan.

**B. Ms. Woodward Was Violently Assaulted After Deputies Deliberately Isolated Ms. Woodward In A Single Cell Hidden from All Security Cameras.**

42.     Cell 211 is located on the second floor of 2B. Cell 211 is next to a stairway and generally isolated from the other cells in 2B.

43.     There are pillars between Cell 211 and the security cameras in the Downtown Detention Center, effectively blocking Cell 211 from surveillance.

44.     No other detainees had access to Cell 211, only Deputies.

45.     The Downtown Detention Center Deputies were aware that Cell 211 was hidden from security cameras and out of the view of other inmates.

46.     Deputy Rivera intentionally and purposefully placed Ms. Woodward in a single cell blocked from surveillance to assault Ms. Woodward. Deputy Phan was aware of her intent when he assisted her in moving Ms. Woodward to that cell.

47.     Ms. Woodward went to sleep as normal in her new cell.

48.     Ms. Woodward woke up in excruciating and unbearable pain. Blood was pouring down her face and she could feel crushed bones in left side of her face. Ms. Woodward's shirt and bedding were soaked in her blood.

49.     As she regained consciousness, Ms. Woodward saw two Deputies— one tattooed female and one Deputy of unknown gender (hereinafter, "Doe Deputy 1 and Doe Deputy 2")— leave Cell 211 and lock the cell door behind them. Ms. Woodward couldn't conclusively identify the Deputies because she was in shock and her eyes were filled with blood.

50.     These Deputies had used physical force to violently assault Ms. Woodward while she was sleeping.

51.    Upon information and belief, Deputy Rivera was one of the Deputies who assaulted Ms. Woodward.

52.    Ms. Woodward proceeded to cry out for help and repeatedly banged against the cell door with her fists, hopeful that Deputies would come to her aid.

53.    All the Deputies on duty in 2B could hear Ms. Woodwards cries and banging, as the 2B area was small. Ms. Woodward could hear noise from the main 2B area while in 211.

54.    No one came to her assistance.

55.    Ms. Woodward tried to triage her injuries with toilet paper. Her bleeding was so severe and substantial that the toilet paper couldn't contain or absorb all the blood.

56.    While outside of Cell 211, another Deputy, Doe Deputy 3, saw Ms. Woodward begging for help through the cell window. Despite the visible trauma and blood on Ms. Woodward's face, Doe Deputy 3 turned a blind eye and walked away.

57.    Ms. Woodward was intentionally ignored for hours while she suffered from the pain of her injuries and increasing blood loss. The pain in Ms. Woodward's face became even more unbearable as the time passed.

58.    On August 6, 2023, Deputies Isabella Rivera, James Phan, Annalissa Reynolds, Andrea Lutz, and Justin Chubb were on duty in 2B.

59.    Deputies are required to conduct rounds, or "well-being checks," every 35 minutes.

60.    Deputy Justin Chubb was conducting checks between midnight and 4:24 AM.

61.    No Deputy conducted a check on cell 211 between 4:24 AM and 6:11 AM.

62.    Between 6:11 AM and 3:45 PM, Deputy Andrea Lutz was scheduled to be conducting well-being checks on Cell 211.

63.    Jail records show that Andrew Lutz was not conducting these checks as scheduled. Instead, she conducted checks at the following times:

a.    6:44 AM; 7:11 AM; 7:45 AM; 8:50 AM; 10:35 AM; 11:57 AM; 12:24 PM; 12:54 PM; 1:19 PM; 1:43 PM; 3:21 PM; and 3:45 PM.

64.    Around the times that Ms. Woodward in excruciating pain and bleeding heavily in her cell, Deputy Lutz was leaving gaps of 1 hour and 4 minutes, 1 hour 45 minutes, and 1 hour 21 minutes, between each of her well-being checks.

65.    Finally, another detainee (the tier porter) heard Ms. Woodward calling for help and saw the blood inside Ms. Woodward's cell. The tier porter promptly went downstairs to alert Deputies to her serious injuries.

66.    Even after being informed of her injuries and serious blood loss, Deputies did not immediately respond to Ms. Woodward—it took Deputies another ten minutes to bother checking on her in Cell 211.

67.    Deputy James Phan removed Ms. Woodward from 211. DDC medical staff arrived at Cell 211 to examine Ms. Woodward's injuries.

68.    Ms. Woodward was admitted to Denver Health on August 6, 2023, at 12:51pm to have her injuries examined. She was classified as an assault victim.

69.    Ms. Woodward's considerable medical team was composed of doctors, nurses, respiratory therapists, pharmacists, social workers, surgeons, and specialists.

70.    Ms. Woodward was treated for closed extensive facial fractures through the left maxillary sinus, orbital floor, lateral orbit rim, and nasal bone. Ms. Woodward had lacerations to the left side of her face and severe bleeding to her scalp. The left side of her face was completely

numb as well as her left arm and leg. Ms. Woodwood also had neurological symptoms and airway complications.

71.    Ms. Woodward required surgery to repair the damage to her left eye and face. Ms. Woodward had a surgical procedure called an Open Reduction Internal Fixation Left Zygomaticomaxillary Complex Fractures  on August 9, 2023, at Denver Health Hospital.

72.    Ms. Woodward remained hospitalized for four days due to the severity of her injuries. She returned to DDC on August 10, 2023.

73.    It took two months for Ms. Woodward to heal from her injuries. But she experienced intense pain and discomfort for much longer than two months.

74.    To this day, Ms. Woodward suffers from frequent headaches and struggles with numbness and sensation loss on the left side of her face. Her left eyebrow is sunken in because of her facial fractures and her left lip is entirely numb.

75.    Ms. Woodward also experienced extreme emotional distress as a result of this incident. She frequently has nightmares and has extreme difficulty falling asleep while incarcerated because she reasonably believes that Deputies may assault her while she is unconscious

76.    Ms. Woodward becomes terrified and tense when any Deputies are physically close to her. This is an incredible burden for an incarcerated individual.

## C.  DCC Deputies Concealed Ms. Woodward's Assault

77.    DDC Deputies are required to create an incident report for all detainee injuries and Deputy uses of force. The policy, effective November 2021, states that "It is the policy of the DSD that employees who participate, witness, or are informed of an incident complete and submit a

written report detailing the information as soon as possible but prior to the conclusion of their shift."

78.    Incident refers to any "non-routine event that requires an action or response." Specifically included in the list of incidents that require a report is "Serious bodily injury," "injury or illness requiring immediate medical attention," and "Use of force."

79.    Despite Ms. Woodward's physical assault, serious bodily injuries, and her transfer to Denver Health, and four-day medical stay, no incident report or documentation was created by any of the Deputies on duty in 2B.

80.    DDC Deputies did not conduct any investigation of Ms. Woodward's assault or injuries.

81.    Ms. Woodward was given no formal written explanation or documentation of her injuries.

82.    Ms. Woodward pleaded with Deputies for an explanation. Almost every Deputy that Ms. Woodward asked responded by saying, "It wasn't me. I didn't touch you." The Deputies' responses indicated that Ms. Woodward was *assaulted by another Deputy*.

83.    Other Deputies tried to psychologically manipulate Ms. Woodward by telling her that she entered DDC with her injuries. Ms. Woodward did not enter DDC with closed extensive facial fractures and severe bleeding.

84.    On August 18, 2023, Ms. Woodward filed a grievance with the Denver Sheriff's Department specifically requesting an explanation for the source of her injuries.

85.     On August 21, 2023, Ms. Woodward filed a second grievance requesting an explanation for her injuries because no one had been able to tell Ms. Woodward how she was injured.

86.     On September 11, 2023, Ms. Woodward received a response to her grievances. The grievance response – reviewed by Micah Diffendal, Deputy Sheriff Captain – stated, "There is not [an] incident that supports inmate Woodward going to the hospital with injuries to her face resulting in the claimed fractures . . . there is a lack of evidence to support inmate Woodward's claims."

87.     Ms. Woodward's grievance was classified as "Unfounded" by Larry Brown, Deputy Sheriff Captain.

88.     This finding was made despite the existence of transportation logs, housing transfer logs, and emergency department activity logs, which show Ms. Woodward was transported to Denver Health.

89.     Further, at the time Ms. Woodward filed her grievance, there would have been surveillance and/or body camera footage from the incident. Upon information and belief, that footage has since been deleted.

90.     As a result of Defendants cover-up of this incident, including the failure to make any incident reports and the subsequent efforts to convince her she had never been injured, Ms. Woodward has been unable to ascertain the identities of the Deputies who assaulted her— interfering with her ability to seek redress for her assault through the courts.

91.     Additionally, this cover-up prevented Ms. Woodward from obtaining any redress through the grievance procedures at DDC.

**D. The City and County of Denver's Unconstitutional Customs, Policies, and Practices Were the Moving Force Behind the Violation of Ms. Woodward's Constitutional Rights**

92.     The Downtown Detention Center has a pattern and practice of deliberately isolating detainees in camera-less cells to assault them.

93.     Cell 211 is beyond the coverage of security cameras and surveillance.

94.     DDC Deputies were aware of the lack of surveillance in the isolated cell.

95.     While at DDC, Ms. Woodward learned that Deputies use Cell 211 to have sexual relations with detainees.

96.     Since 2020, there have been 22 recorded incidents in cell 211 alone involving a use of force, a PREA incident, an injury or sickness, or an ambulance run. Notably, these are just the incidents for which a report was actually created.

97.     Deputies at the DDC have also previously placed detainees in other cells without video surveillance to assault them. For example, on April 25, 2021, Scott Peters was placed in a camera-less jail cell at the DDC, where he was beaten with nun chucks. As a result, Mr. Peters brought an excessive force claim, which was settled for $400,000.[2]

98.     DDC also has a pattern and practice of delaying the delivery of necessary medical care to detainees while in the booking area.

99.     While incarcerated at the DDC, Ms. Woodward observed Deputies forcing detainees in the booking area to stay in beds and cells covered with vomit and feces, taking no

---

[2] *Scott Peters v. City and County of Denver, et al*., U.S. District Court of the District of Colorado, Case No. 2023-cv-00750-RM-JPO. The City Council of Denver approved the settlement in this matter on June 10, 2024. https://denver.legistar.com/LegislationDetail.aspx?ID=6717115&GUID=A3BD7D30-321E-4742-B55F-6AEF574B47EC

action to get vomit, feces, or other hazardous bio-waste cleaned up, instructing detainees to wait for medical to come the next day, even when they had immediate and time-sensitive injuries and illnesses.

100.    Specifically, Ms. Woodward observed many detainees who were suffering from severe withdrawal symptoms who were not provided with any medical attention, and whose pleas for help were repeatedly ignored by Deputies.

101.    In line with this pattern, Ms. Woodward's cries for aid were ignored by Deputies while she bled heavily in cell 211 due to her severe facial injuries.

102.    DDC also has a pattern and practice of permitting its Deputies to neglect their duties of conducting regular 35-minute well-being checks on detainees.

103.    DDC Deputies are supposedly required to conduct well-being check every 35 minutes to ensure detainee safety. DDC tracks the well-being checks conducted by Deputies electronically, and monitors compliance.

104.    Deputies do not comply with the 35-minute rule, and this non-compliance is recorded electronically in DDC records. However, no action was taken by DDC to ameliorate this issue, despite being aware of the problem.

105.    For example, from August 6, 2023, until August 7, 2023, just in the 2B block, there were 111 instances of non-compliance with the 35-minute check rule.

106.    DDC's own monitoring system registered compliance rates of 69%, 68%, 69%, 64%, 69%, 62%, 71%, 67%, 64%, and 69% for well-being checks on cells within 2B.

107.     Even when Deputies did conduct their rounds, Ms. Woodward observed that they simply glanced counted detainees instead of actually taking the time to do a meaningful evaluation of detainee safety and well-being.

108.     Lastly, DDC has a practice of covering up assaults of inmates by Deputies, by failing to file appropriate incident reports. The fact that Ms. Woodward was transported to the hospital with severe injuries, and no incident report was created by any of the multiple Deputies on duty or their supervisors, is indicative of an officially endorsed practice within DDC of covering up Deputy misconduct.

## STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment Violation - Excessive Force
### (Against All Individual Defendants)

109.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

110.     At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacity as a Downtown Detention Center Deputies and within the scope of their employment.

111.     At the time when Plaintiff was assaulted, she had a clearly established constitutional right under the Eighth Amendment to the United States Constitution to be free from the use of excessive force.

112.     Any reasonable Deputy knew or should have known of this clearly established right.

113.    At all times immediately preceding, during, and after the incident Ms. Woodward poised no immediate threat to the safety to Defendants, other Deputies, herself, or any other detainees, as she was unconscious.

114.    Deputy Rivera deliberately isolated Ms. Woodward in a single cell blocked from security cameras to strategize and execute an assault on Ms. Woodward's person.

115.    There was no situation occurring that would reasonably require Doe Deputies 1 and 2 or any other Deputy to apply force—or take any action—to maintain or restore discipline.

116.    Deputy Rivera, and Doe Deputies 1 and 2 had no legally valid basis to assault Plaintiff's person under the circumstances and in the manner described herein.

117.    There was no need for the application of any amount of force towards Plaintiff, and there is no legitimate penological justification for Deputy River and Doe Deputies 1 and 2's conduct.

118.    The risk of injury to Plaintiff by using physical force to injury her face and body was obvious.

119.    Deputy Rivera and Doe Deputies 1 and 2's use of force against Plaintiff was objectively unreasonable under the circumstances.

120.    Defendants acted maliciously and sadistically for the very purpose of causing harm to Plaintiff

121.    Defendants James Phan, Annalissa Reynolds, Andrea Lutz, and Justin Chubb were aware of Deputy River and Doe Deputy 1 and 2's conduct and the serious harm that was being inflicted on Plaintiff and had the opportunity to stop the assault.

122.     Defendants Phan, Annalissa Reynolds, Andrea Lutz, and Justin Chubb made a conscious and deliberate decision not to take any action to protect Plaintiff from this excessive use of force.

123.     Defendants' failure to protect Plaintiff was the legal and proximate cause of Plaintiff's damages. But for the inaction of Defendants, Plaintiff would not have been subjected to a violation of her constitutional rights by Defendant Rivera and Doe Deputies 1 and 2.

124.     Defendants' excessive use of force caused excruciating pain and severe injuries to Plaintiff, which required her to be hospitalized at Denver Health for four days.

125.     As a direct and proximate consequence of Defendants' conduct, Plaintiff suffered physical and mental injury, including pain and suffering, humiliation, emotional distress, and other injuries, damages, and losses due to Defendants' actions.

126.     Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights, which entitles Plaintiff to punitive damages.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violation – Conditions of Confinement**
**(Against All Defendants)**

127.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

128.     At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacity as a Downtown Detention Center Deputies and within the scope of their employment.

129.    At the time when Plaintiff was assaulted, she had a clearly established constitutional right under the Eighth Amendment to the United States Constitution to be free from constitutionally inadequate conditions of confinement.

130.    Any reasonable Deputy knew or should have known of this clearly established right.

131.    Isolating an incarcerated individual in a single cell beyond the coverage of security cameras and surveillance for an extended period objectively constitutes a substantial risk of serious harm to that individual.

132.    Any reasonable Deputy knew of should have known of this risk.

133.    Defendants Phan, Annalissa Reynolds, Andrea Lutz, and Justin Chubb and Doe Deputies 1, 2, and 3 were specifically aware of the risk of serious harm as they witnessed Deputy Rivera isolate Plaintiff into a cell beyond the coverage of security cameras and surveillance.

134.    Deputy Rivera and Doe Deputies 1 and 2 acted sadistically and maliciously with the intent to cause harm to Plaintiff.

135.    Defendants Phan, Annalissa Reynolds, Andrea Lutz, and Justin Chubb and Doe Deputies 1, 2, and 3 were deliberately indifferent to the serious risk of harm posed to Plaintiff from Rivera's conduct.

136.    Defendants deliberate indifference to that conduct was the direct and proximate cause of excruciating pain and injuries to Plaintiff.

137.    As a result of Defendants' conduct, Plaintiff suffered physical and mental injury, including pain and suffering, humiliation, emotional distress, and other injuries, damages, and losses.

138.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights, which entitles Plaintiff to punitive damages.

### THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Fourteenth Amendment - Deliberate Indifference to Medical Needs
### (Against All Individual Defendants)

139.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

140.    At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacity as a Downtown Detention Center Deputies and within the scope of their employment.

141.    At all times relevant to the subject matter of this Complaint, Plaintiff had a clearly established constitutional right under the Eighth Amendment to the United States Constitution to be free from deliberate indifference to her medical needs.

142.    Any reasonable Deputy knew or should have known of this clearly established right.

143.    Leaving a severely injured and heavily bleeding inmate alone with no medical attention for nearly an hour poses a substantial risk to an individual and constitutes as deliberate indifference to medical needs.

144.    Any reasonable Deputy knew or should have known of this risk.

145.    Deputy Rivera and Doe Deputies 1 and 2 were made aware of Plaintiff's medical needs after they assaulted her and left her bleeding and injured in Cell 211.

146.    Deputies Isabella Rivera, Annalissa Reynolds, Andrea Lutz, and Justin Chubb were specifically aware of Plaintiff's medical needs because they were on duty in 2B and could hear Plaintiff crying in pain and pounding at her cell door for nearly an hour. Deputy James Phan was also involved in moving Ms. Woodward in and out of cell 211, and upon information and belief, was present in 2B during the time Plaintiff was crying in pain.

147.    Defendants were also made aware of Plaintiff's serious medical needs when they conducted their routine checks on detainees at the Downtown Detention Center.

148.    Doe Deputy 3 was also aware of Ms. Woodward's serious medical needs, as Doe Deputy 3 saw Ms. Woodward begging for help in her cell, and saw the blood on her face.

149.    Despite being aware of Ms. Woodward's serios medical needs, no Deputy took any action to assist her. Defendants were deliberately indifferent to Plaintiff's serious medical needs.

150.    Defendants' deliberate indifference was the direct and proximate cause of excruciating pain to Plaintiff.

151.    If not for Defendants' deliberate indifference to Plaintiff's medical needs, Plaintiff would not have experienced significant blood loss and extended agonizing pain.

152.    As a result of Defendants' conduct, Plaintiff suffered physical and mental injury including pain and suffering, humiliation, emotional distress, and other injuries, damages, and losses.

153.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights, which entitles Plaintiff to punitive damages.

**FOURTH CLAIM FOR RELIEF**
**C.R.S. 13-21-131**
**Colo. Const. art. 2 sec. 20**
**(Against All Individual Defendants)**

154.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

155.    At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacity as a Downtown Detention Center Deputies and within the scope of their employment.

156.    At the time when Plaintiff was assaulted, she had a clearly established constitutional right under Article II, Section 20 of the Colorado Constitution to be free from cruel and unusual punishments, including the use of excessive force.

157.    Any reasonable Deputy knew or should have known of this clearly established right.

158.    At all times immediately preceding, during, and after the incident Ms. Woodward poised no immediate threat to the safety to Defendants, other Deputies, herself, or any other detainees, as she was sleeping.

159.    There was no situation occurring that would reasonably require Doe Deputies 1 and 2 or any other Deputy to apply force—or take any action—to maintain or restore discipline.

160.    Deputy Rivera deliberately isolated Ms. Woodward in a single cell blocked from security cameras to strategize and execute an assault on Ms. Woodward's person.

161.    Deputy Rivera, and Doe Deputies 1 and 2 had no legally valid basis to assault Plaintiff's person under the circumstances and in the manner described herein.

162.     There was no need for the application of any amount of force towards Plaintiff, and there is no legitimate penological justification for Deputy River and Doe Deputies 1 and 2's conduct.

163.     The risk of injury to Plaintiff by using physical force to injury her face and body was obvious.

164.     Deputy Rivera and Doe Deputies 1 and 2's use of force against Plaintiff was objectively unreasonable under the circumstances.

165.     Defendants acted maliciously and sadistically for the very purpose of causing harm to Plaintiff

166.     Defendants Phan, Annalissa Reynolds, Andrea Lutz, Justin Chubb, and Doe Deputy 3 were aware of Deputy River and Doe Deputy 1 and 2's conduct and the serious harm that was being inflicted on Plaintiff and had the opportunity to stop the assault.

167.     Defendants Phan, Annalissa Reynolds, Andrea Lutz, and Justin Chubb made a conscious and deliberate decision not to take any action to protect Plaintiff from Deputy Rivera and Doe Deputy 1 and 2's excessive use of force.

168.     Defendants' failure to protect Plaintiff was the legal and proximate cause of Plaintiff's damages. But for the inaction of Defendants, Plaintiff would not have been subjected to a violation of her constitutional rights by Defendants Rivera and Doe Deputies 1 and 2.

169.     Defendants' excessive use of force caused excruciating pain and severe injuries to Plaintiff, which required her to be hospitalized at Denver Health for four days.

170.    As a direct and proximate consequence of Defendants' conduct, Plaintiff suffered physical and mental injury, including pain and suffering, humiliation, emotional distress, and other injuries, damages, and losses due to Defendants' actions.

171.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's constitutionally protected rights, which entitles Plaintiff to punitive damages.

### FIFTH CLAIM FOR RELIEF
### C.R.S. 13-21-131
### Colo. Const. art. 2 sec. 20
### (Against All Individual Defendants)

172.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

173.    At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacity as a Downtown Detention Center Deputies and within the scope of their employment.

174.    At all times relevant to the subject matter of this Complaint, Plaintiff had a clearly established constitutional right under Article II, Section 20 of the Colorado Constitution to be free from deliberate indifference to her medical needs.

175.    Leaving a severely injured and heavily bleeding inmate alone with no medical attention for nearly an hour poses a substantial risk to an individual and constitutes as deliberate indifference to medical needs.

176.    Any reasonable Deputy knew or should have known of this risk.

177.    Deputy Rivera and Doe Deputies 1 and 2 were made aware of Plaintiff's medical needs after they assaulted her and left her bleeding and injured in Cell 211.

178.    Deputies Isabella Rivera, Annalissa Reynolds, Andrea Lutz, and Justin Chubb were specifically aware of Plaintiff's medical needs because they were on duty in 2B and could hear Plaintiff crying in pain and pounding at her cell door for nearly an hour. Deputy James Phan was also involved in moving Ms. Woodward in and out of cell 211, and upon information and belief, was present in 2B during this time and could hear Ms. Woodward crying in pain.

179.    Defendants were also made aware of Plaintiff's serious medical needs when they conducted their routine checks on detainees at the Downtown Detention Center.

180.    Doe Deputy 3 was also aware of Ms. Woodward's serious medical needs, as Doe Deputy 3 saw Ms. Woodward begging for help in her cell, and saw the blood on her face.

181.    Despite being aware of Ms. Woodwards serios medical needs, no Deputy took any action to assist her. Defendants were deliberately indifferent to Plaintiff's serious medical needs.

182.    Defendants' deliberate indifference was the direct and proximate cause of excruciating pain to Plaintiff.

183.    If not for Defendants' deliberate indifference to Plaintiff's medical needs, Plaintiff would not have experienced significant blood loss and extended agonizing pain.

184.    As a result of Defendants' conduct, Plaintiff suffered physical and mental injury including pain and suffering, humiliation, emotional distress, and other injuries, damages, and losses.

185.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's constitutionally protected rights, which entitles Plaintiff to punitive damages.

### SIXTH CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Unconstitutional Policies, Customs, and Practices
### (Against Defendant City and County of Denver)

186.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

187.    Defendant City and County of Denver enforces local and state law through its law enforcement agencies, including the Denver Sheriff's Department and the Downtown Detention Center.

188.    The Downtown Detention Center has a pattern and practice of deliberately isolating detainees in camera-less cells to assault them.

189.    DDC has a pattern and practice of delaying the delivery of necessary medical care to detainees while in the booking area.

190.    DDC has a pattern and practice of permitting its Deputies to neglect their duties of conducting regular 35-minute well-being checks on detainees.

191.    DDC has a practice of covering up assaults of inmates by Deputies, by failing to file appropriate incident reports. The fact that Ms. Woodward was transported to the hospital with severe injuries, and no incident report was created by any of the multiple Deputies on duty or their supervisors, is indicative of an officially endorsed practice within DDC of covering up Deputy misconduct.

192.    The Defendant City and County of Denver was deliberately indifferent to the substantial risk of harm posed by their inadequate policies, practices, training, and supervision which were all the proximate cause of the violations of Plaintiff's constitutional rights.

193.     All the acts described herein were done by the Defendants intentionally, knowingly, willfully, wantonly, maliciously, and/or recklessly in disregard for Plaintiff's constitutionally protected rights and were done pursuant to the customs, policies, practices, and insufficient training, and supervision of Defendant City and County of Denver.

**SEVENTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**Denial of Access to the Courts**
**First and Fourteenth Amendments**
**(Against All Defendants)**

194.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

195.     At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacity as a Downtown Detention Center Deputies and within the scope of their employment.

196.     At the time when Plaintiff was assaulted, she had a clearly established constitutional right of access to the courts.

197.     Any reasonable Deputy knew or should have known of this clearly established right, and that intentionally lying about an event, in addition to the deliberate cover up, destruction, and concealment of evidence, violated that clearly established constitutional right.

198.     Defendants intentionally concealed Ms. Woodward's assault by purposefully failing to create incident reports, failing to preserve video evidence of her assault, and deliberately lying to Ms. Woodward about the source of her injuries and her hospitalization.

199.    Defendants' concealment of evidence and cover-up of Ms. Woodwards assault obstructs her ability to prove the identities of the Deputies who assaulted her, including through the potential presentation of video evidence in support of her claims.

200.    As a direct and proximate consequence of Defendants' conduct, Plaintiff ability to bring the above-listed claims arising out of her assault has been obstructed, therefore denying her access to the courts.

201.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's federally protected rights, which entitles Plaintiff to punitive damages.

## EIGHTH CLAIM FOR RELIEF
### C.R.S. 13-21-131
### Colo. Const. art. 2 sec. 24 and 25
### Denial of Access to the Courts
### (Against All Defendants)

202.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

203.    At all times relevant to the subject matter of this Complaint, Defendants were acting under color of state law in their capacity as a Downtown Detention Center Deputies and within the scope of their employment.

204.    At the time when Plaintiff was assaulted, she had a clearly established right of access to the courts under the Colorado Constitution.

205.    Any reasonable Deputy knew or should have known of this clearly established right, and that intentionally lying about an event, in addition to the deliberate cover up, destruction, and concealment of evidence, violated that clearly established constitutional right.

206.    Defendants intentionally concealed Ms. Woodward's assault by purposefully failing to create incident reports, failing to preserve video evidence of her assault, and deliberately lying to Ms. Woodward about the source of her injuries and her hospitalization.

207.    Defendants' concealment of evidence and cover-up of Ms. Woodwards assault obstructs her ability to prove the identities of the Deputies who assaulted her, including through the potential presentation of video evidence in support of her claims.

208.    As a direct and proximate consequence of Defendants' conduct, Plaintiff ability to successfully bring the above-listed claims arising out of her assault has been obstructed, therefore denying her access to the courts.

209.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly, and/or in reckless disregard of Plaintiff's constitutionally protected rights.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, and grant:

(a)    Appropriate declaratory and other injunctive and/or equitable relief;

(b)    Compensatory and consequential damages, including damages for physical injury, emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(c)    All economic losses on all claims allowed by law;

(d)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)    Attorney's fees and the costs associated with this action, as well as expert

29

witness fees, on all claims allowed by law;

(f)    Pre- and post-judgment interest at the lawful rate to the maximum extent allowed

by law; and

(g)    Any further relief that this court deems just and proper, and any other relief as

allowed by law.

**PLAINTIFF REQUESTS A TRIAL TO A JURY ON ALL ISSUES SO TRIABLE.**

Dated this 5th of August 2025.

TYRONE GLOVER LAW, LLC

*s/ A. Tyrone Glover*
A. Tyrone Glover
Helen Oh
Genevieve Mesch
2590 Walnut Street
Denver, CO 80205
303-577-1655
tyrone@tyroneglover.com
helen@tyroneglover.com
genevieve@tyroneglover.com